FILED
SEP - 5 2006
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY             DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CARLSBAD MUNICIPAL WATER DISTRICT, a Public Agency,<br><br>                          Plaintiff,<br><br>vs.<br><br>CROWN CASTLE GT COMPANY LLC, a Delaware limited liability company, and NEW CINGULAR WIRELESS SERVICES, INC. fka AT&T WIRELESS SERVICES, INC. a Delaware corporation,<br><br>                          Defendants. | CASE NO. 05cv900 BTM (WMc)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. # 48-1]** |

Plaintiff Carlsbad Municipal Water District ("Carlsbad"), a subsidiary of the City of Carlsbad, has filed a declaratory relief action against Crown Castle GT Company LLC ("Crown Castle") and New Cingular Wireless Services, Inc. ("New Cingular"). Carlsbad asks the Court to declare that Crown Castle and its sublessor, New Cingular, impermissibly (pursuant to a lease option) extended their lease. For the reasons discussed below, the motion is **DENIED**.

I.   BACKGROUND

The following facts are largely undisputed. Plaintiff Carlsbad is the current owner of three parcels of land commonly known as the Twin "D" tank site. On July 17, 1985, the Costa Real Municipal Water District (Carlsbad's predecessor) entered into a Lease

Agreement with Gencom, Inc. (Crown Castle's predecessor), a wireless service provider. The lease granted Gencom use of a portion of the site for an unmanned transmission station for mobile telephone, cellular telephone, and paging services. Crown Castle's Resp. to Pl.'s SSOF, 2. The lease provided for a ten year term ending May 31, 1995, and further granted Gencom the option to extend the term for four 5 year periods thereafter. (The option therefore granted the lessee options to renew the lease for a total of twenty years, until 2015.) Since this initial lease date, Gencom's interest has been transferred to various entities. See Crown Castle's Resp. to Pl.'s SSOF, 6. Crown Castle is the most recent of these transferees. In addition, the City of Carlsbad annexed the leased land from the County of San Diego in 1987. Id., 12.

Defendant Crown Castle is the current lessee of the relevant portion of land and owner and operator of an 80' monopole on the Twin D site. Id., 7. On November 4, 2004, it exercised its option to continue the lease another five years, through 2010. See Smith Decl. ¶ 5. Defendant New Cingular owns and operates cellular antennas and transmission equipment on Crown Castle's monopole through a sublease arrangement with Crown Castle. Crown Castle's Resp. to Pl.'s SSOF, 8. It became the current owner of the antennas on the monopole through a merger with AT&T in October 2004. Id., 9.

The following chronology outlines events occurring between 1985 and the present. In March 1994, Genecom's successor, US West Cellular, Inc. applied to the City of Carlsbad for a Conditional Use Permit ("CUP") to extend the monopole height from 60' to 80'. Id., 19. Apparently, US West needed to increase the height because of the planned construction of two additional water reservoirs at the site that would block signals from the monopole. While the parties devote significant portions of their briefs to recreating a precise timeline of the specific correspondence that followed the application for a CUP, the particulars are not dispositive for the purposes of this motion. Instead, it is sufficient to note that Terry Woods of the City Planner's office processed the application. On July 1, 1994, she sent a letter to Larry Doherty, of US West, stating that a CUP was not necessary for the proposed extension of the monopole. See id., 21.

Because the monopole was as of 1994 in a Limited Control Zone ("L-C zone"), which is "an interim zone for areas where planning for future land uses has not been completed," the area could be rezoned at a later date, presumably to account for growth. Id. 15-16. It is apparently undisputed that under the Municipal Code existing at the time, a CUP was not issued for uses in this L-C zone. See May Decl. ¶ 9; Pl's. Resp. to Crown Castle Material Facts in Opp'n, 15. The City of Carlsbad issued a tenant improvement building permit to US West for the 80 ft tower in November 1994. Crown Castle Resp. To Pl's. SSOF, ¶ 24. By this date, US West had apparently complied with the City's other instructions, procuring *inter alia*, a Coastal Development Permit, a Conditional Negative Declaration and an Industrial Building Permit from the City. Id. ¶ 10.[1]

Defendant Crown Castle acquired the site from GTE in 2000. The CUP (or lack thereof) became an issue in 2002, when Crown Castle inquired about adding carrier Cingular Wireless (which became part of Defendant New Cingular in 2004) to the monopole. In the fall of 2002, Carlsbad, in two letters, responded by asserting that Crown Castle's operation of a cellular site without the appropriate CUP constituted a violation of local law, and therefore a breach of the lease. See Parker Decl. Exs. T & U. Carlsbad stated that it would not process Crown Castle's application to add (or "collocate") Cingular Wireless "unless this cellular facility can be brought into compliance with the local zoning law." Id., Ex. W.

A series of correspondence between Carlsbad and Crown Castle ensued. Crown Castle insisted that its predecessor US West had obtained the required permits in 1994 and that it had been advised then that no CUP was needed. Crown Castle acknowledged that its proposed sublease agreement with Cingular Wireless would require a new land use permit, but insisted that it first needed permission to obtain consent to sublease from its landlord, the Plaintiff. Id., Ex. V. Carlsbad responded in an October 2, 2002 letter in which it admitted that the prior statement that no CUP was needed had been an error.

---

[1] On January 20, 1995, Mary May, a planner representing US West, sent a letter to the City. It confirmed the company's understanding that when the L-C zone "is changed at some point in the future, a conditional use permit may be required pursuant to the regulations of the new zone . . . ." Parker Decl., Ex. O. Although the Plaintiff emphasizes this letter's importance, it does not control the Court's ruling on the motion.

Nevertheless, it stated that it would not "entertain any proposal for modification of the site unless this cellular facility is brought into compliance with local zoning law." Id., Ex. W. The parties essentially repeated these positions in letters exchanged in late 2002 and early 2003.

In February 2003, Crown Castle National Manager for Zoning Compliance, Robert E. Smith, participated in a conference call with representatives from the Carlsbad Planning Department, Real Estate Department, and the City counsel's office. Smith states in his declaration that Carlsbad stated that it would not consider the collocation request from Crown Castle until it had completed its safety study of the tower D site. Smith Decl. ¶ 14. Carlsbad further advised Crown Castle that compliance with Policy 64 would be a prerequisite to considering the collocation request. Id. Policy 64, enacted by the City of Carlsbad in 2001, was passed "to guide the public, applicants, boards and commissions, and staff in reviewing the placement, construction, and modification of WCFs [wireless communication facilities]." Parker Decl. Ex. AA, p. 109. On its face, therefore, the Policy was intended to serve as guidance. Nevertheless, it clearly states that "[t]hese guidelines should be followed in the review of conditional use permits for new wireless facilities as well as extensions and amendments to CUPs for existing installations." Id., p. 112. It is apparently undisputed that under the Policy, WCFs should comply with existing height limits of the zone in which they are located. The existing height limit for the L-C zone is 35' and for the R-1 zone is 30'. See Smith Decl. ¶ 15.

In October 2003, Crown Castle's proposed sub-tenant Cingular Wireless submitted a preliminary review for a CUP proposing to add antennas to the monopole. Crown Castle Resp. to Pl.'s SSOF, 35. By letter dated November 12, 2003, Carlsbad, through its Planning Department, issued a letter with its preliminary review. In its discussion, the letter stated that a "conditional use permit is required for all wireless facilities in the city" and that the additions could not be approved until the monopole could be brought into compliance with the Zoning Ordinance and Policy 64. Parker Decl. Ex. BB.

On February 3, 2004, the land was rezoned by the City of Carlsbad from L-C to R-1 (one family residential zone) at the request of the Water District to allow for construction of

additional infrastructure on the Twin D tank site. Crown Castle Resp. To Pl.'s SSOF, 37. Both sides admit that, per a September 28, 2004 city ordinance, wireless telecommunications facilities are a permitted use of R-1 areas. Id., 42.

On March 1, 2004, Carlsbad again contacted Crown Castle, insisting that Crown Castle obtain a CUP for the site at issue. Id. Ex. CC. Crown Castle responded in an April 18, 2004 letter that it did not agree that a Conditional Use Permit was required. Id. Ex. DD. Between this period and the filing of the current motion, the parties continued to correspond regarding the CUP. While Carlsbad stresses the fact that Crown Castle consistently ignored its warning that Crown Castle was in breach of the lease, Crown Castle points to its efforts to accommodate the City's demands concerning compliance with Policy 64 and the height of the structure. Each side insists that it was the other who was unreasonable and obstinate.

As noted earlier, on November 4, 2004, Crown Castle informed Carlsbad that it was exercising its option to extend the lease for another five years through May 2010. Carlsbad replied that it was rejecting Crown Castle's request to extend the lease agreement, citing Crown Castle's failure to even attempt to bring the facility into compliance with local zoning laws. Crown Castle's Resp. to Pl.'s SSOF, 43-44. On March 10, 2005, Carlsbad, through its City Attorney's office, informed Crown Castle by letter of its intention to file a declaratory relief action to confirm that Crown Castle is not entitled to renew its lease.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson, 477 U.S. at 248; Freeman v. Arpaio,125 F.3d 732, 735 (9th Cir. 1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248.

1    A party seeking summary judgment always bears the initial burden of establishing the
2 absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Although the
3 nonmoving party bears the burden of proof on a matter at trial, the moving party need only
4 demonstrate to the Court that there is insufficient evidence to support the nonmoving party's
5 case. Id. at 325. The moving party can satisfy this burden in two ways: (1) by presenting
6 evidence that negates an essential element of the nonmoving party's case; or (2) by
7 demonstrating that the nonmoving party failed to establish an essential element of the
8 nonmoving party's case on which the nonmoving party bears the burden of proof at trial.
9 See Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant
10 of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d
11 626, 630 (9th Cir. 1987).

12    Once the moving party establishes the absence of genuine issues of material fact, the
13 burden shifts to the nonmoving party to set forth facts showing that a genuine issue of
14 disputed fact remains. See Celotex, 477 U.S. at 314. The nonmoving party cannot rest on
15 the mere allegations or denials of his pleading, but must "go beyond the pleadings and by
16 his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file'
17 designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citing
18 Fed. R. Civ. P. 56(c)). When making this determination, the court must view all inferences
19 drawn from the underlying facts in the light most favorable to the nonmoving party. See
20 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fontana
21 v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The court must not weigh the evidence or
22 make credibility determinations in evaluating a motion for summary judgment. See
23 Anderson, 477 U.S. at 255.

### III. DISCUSSION

26    Plaintiff advances several arguments why it is entitled to summary judgment, but
27 these arguments fail on the present motion. Although the Plaintiff argues that Defendants
28 are in violation of the lease, the Defendants have not been officially declared to be in

1  violation because the City has not followed its abatement procedures, as required under its
2  Municipal Code. Alternatively, it argues that the 1994 extension of the monopole (from 60'
3  to 80' feet) rendered the site an illegal nonconforming use. However, there is insufficient
4  evidence in the record to support such a finding. Finally, even if the tower were an illegal
5  nonconforming use, estoppel may apply, preventing this Court from finding that the
6  Defendants are in breach of the lease.

7  Under the guidelines as established in the Carlsbad Municipal Code, the monopole
8  at issue is currently a nonconforming building. A nonconforming building is a "building . . .
9  which was lawfully erected or altered and maintained, but which . . . no longer conforms to
10 the use, height, or area regulations of the zone in which it is located." Carlsbad Municipal
11 Code [hereinafter simply "Code"] § 21.04.275. Here the monopole was lawfully erected in
12 1985 and was originally permitted by the County of San Diego in 1984 for a ten year period.
13 Smith Decl. ¶ 4;[2] Def. Crown Castle's Resp. to Pl.'s SSOF, 10. After the City annexed the
14 land in 1987, it was classified as an L-C zone. Pursuant to the then existing municipal code,
15 both sides agree that CUPs were not issued for uses in the L-C zone. May Decl. ¶ 8; Pl.'s
16 Resp. to Def. Crown Castle's Material Facts in Opp'n, 15.

17 After being informed that a CUP would not be required for its 1994 proposed tenant
18 improvement, Crown Castle predecessor US West obtained the requisite permits. The City
19 conducted a final review and approved the site. May Decl. ¶ 13. While US West and the
20 City apparently agreed that a CUP would be necessary in the event of rezoning, no rezoning
21 took place until 2004. Nevertheless, in September 2002, Plaintiff discovered the absence
22 of the allegedly required CUP after Crown Castle requested consent to add a new carrier to
23 the monopole.

24 It is unclear on which provision or area of the Code Plaintiff bases its contention that
25 a CUP is and has been necessary since at least 2002. Indeed, the letter dated September
26 19, 2002 which states that the "City [Carlsbad] requires approval of a Conditional Use Permit

---

[2] Although Smith states that the County of San Diego issued its Major Use Permit to Gencom in 1983, this is apparently a misstatement.

for any cellular antenna system in the City boundaries" does not specify a provision or code section. While this position could be presumably based on Policy 64 and the requirements of R-1 zoning, the Court's role here is not to speculate, but to determine, whether, as a matter of law, Defendants are in violation of the terms of the lease. The Court cannot do so because the City has never formally complied with its municipal code and officially declared Crown Castle to be in violation.

According to the Carlsbad Municipal Code, where there is a non-conforming condition, it "shall be the responsibility of the planning commission, on its own initiative, to fix a date upon which the nonconforming building was established . . ." Code § 21.48.070. Prior to determining the date for abatement, the Commission is required to consider "all pertinent data," including allowing the owner of record to present evidence demonstrating the investment represented in the nonconforming structure to "assure that the investment represented by such structural alterations . . . may be amortized." Id. "When the date of abatement has been determined, the commission by resolution, shall establish such date and shall set forth such facts as bear upon the case upon which the determination of such date of abatement is based, and shall formally notify the owner of such nonconforming property of the action of the commission . . . ." Id.

No notice or formal resolution by the commission has been issued. Even if the series of letters beginning with the September 2002 letter were construed as formal notice, under Code § 21.48.060, Crown Castle, whose monopole has been in an R-1 zone since 2004, would still be allowed a minimum of five years to completely remove or alter the nonconforming building "to structurally conform to the uses permitted in the zone in which it is located . . . upon notice from the planning commission."[3] Thus, even assuming the City could force abatement of the site and assuming the September 2002 letter provided the required notice, the five year minimum period would not have elapsed. In short, the City of Carlsbad has apparently not satisfied its own administrative procedures in addressing the

---

[3] The Court here makes no determination as to the application of Code § 21.48.060(a) to the facts of the case. It is merely relying on the plain language of the Code. Crown Castle may in fact have more than five years to conform. See, e.g., Code § 21.48.060(a)(4)(D)

monopole. Until it does so, Defendants are not in breach of the Municipal Code. Therefore, Crown Castle cannot be said to be in breach of the lease as of this date; its sublessor New Cingular is similarly not in breach of the lease agreement.

In reply, Plaintiff argues that the site was no longer legally nonconforming when the monopole's height was extended from 60' to 80'. See Reply 7-8. Whether the site became an illegal nonconforming use in 1994 is a determination the Court cannot make based on the record before it. Plaintiff cites to Code § 21.48 as support for its argument that the tower, while a legal nonconforming use before the extension, became illegal after it. While they do not specify which particular provision of § 21.48 applies, it is possible that they are referring to § 21.48.010, which states that "while a nonconforming use exists on any lot, no additional use may be established thereon, even though such use would be a conforming use." § 21.48.080 could also potentially apply, which states that "[e]xcept as provided in this section, a nonconforming use or building shall not be altered, improved, reconstructed, restored, repaired, intensified, expanded or extended."

Nevertheless, this argument is undermined by two facts: (1) the City issued a tenant improvement permit authorizing the height increase and (2) U.S. West, Crown Castle's predecessor complied with the City's instructions in modifying the monopole. The City even told U.S. West that no CUP was needed for the height increase, but directed it to obtain several other permits. These acts support a strong factual inference that even the City of Carlsbad did not think the extension of the tower's height in 1994 was a violation of local law.

Even if the extension did in fact render the tower illegal in 1994, estoppel may apply. "Generally speaking four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury." City of Long Beach v. Mansell, 3 Cal. 3d 462, 489 (1970) (quoting Driscoll v. City of Los Angeles, 67 Cal. 2d 297, 305 (1967)). "The government may be bound by an equitable estoppel in the same manner

as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." Id. at 498. See also Farrell v. County of Placer, 23 Cal. 2d. 624, 627-628 (1944) ("there are many instances in which an equitable estoppel in fact will run against the government where justice and right require it."). However, it is well-established that "an estoppel will not be applied against the government if to do so would effectively nullify a strong rule of policy, adopted for the benefit of the public." City of Long Beach, 3 Cal. 3d at 493. Plaintiff has not introduced any evidence to show that the tower is even a nuisance, or why declaring the tower to be an illegal nonconforming use after the City ratified its expansion constitutes a strong rule of policy, adopted for the benefit of the public. In any event, the case does not yet turn on the estoppel issue because the Court cannot hold on the record before it that the tower is an illegal nonconforming use.

## IV. CONCLUSION

Each side has filed various objections in connection with this motion. The Plaintiff has objected to evidence submitted by Crown Castle and New Cingular in support of their opposition. (Doc.'s # 93 & 94). The objections are overruled because the Court's denial is based on an independent review of the record and results ultimately from its interpretation of the Carlsbad City Municipal Code and the *lack* of evidence to show compliance with its provisions. For these same reasons, Plaintiff's objections to the Defendants' response to its statement of undisputed material facts (Doc. #92) are overruled. Finally, each Defendant has filed objections to Plaintiff's notice of lodgment (Doc.'s # 67 & 78). These objections are overruled.

In addition, both Plaintiff and Defendants have filed objections to pretrial disclosures. The Plaintiff's objections to the Defendants' pretrial disclosures are overruled as premature (Doc. # 85). Any objection to evidence should be brought in a motion in limine to be filed

three weeks before trial. The motions in limine should be limited to three pages per motion (an attack on a particular piece of evidence). Neither party need respond in writing to any motion in limine, but may respond in writing if they so choose. Any response must be filed no later than two weeks before trial. The Court will entertain oral responses. Each side is limited to a maximum of five motions in limine. The Defendants' objections to Plaintiff's untimely pretrial disclosures (Doc. #83) are also overruled because there is no showing of prejudice.

    For the reasons discussed above, the Plaintiff's motion is **DENIED**. The Court will hold a status conference on **September 21, 2006** at **11:30am** to set further dates.

**IT IS SO ORDERED.**

Dated: September 1, 2006

**HONORABLE BARRY TED MOSKOWITZ**

United States District Judge

cc:    Magistrate Judge McCurine

       All counsel of record